**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 20, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FRANK DUANE WELCH,

      Petitioner-Appellant,

v.

MARTY SIRMONS, Warden, Oklahoma
State Penitentiary,

      Respondent-Appellee.

No. 05-6159

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-O1-587-R)**

---

James L. Hankins (Robert L. Wyatt, IV, Wyatt Law Office, Oklahoma City, Oklahoma,
with him on the briefs), The Coyle Law Firm, Oklahoma City, Oklahoma, for Petitioner-
Appellant.

Seth S. Branham, Assistant Attorney General (W. A. Drew Edmondson, Attorney General
of Oklahoma, with him on the brief), State of Oklahoma, Oklahoma City, Oklahoma, for
Respondent-Appellee.

---

Before **HENRY, BRISCOE,** and **O'BRIEN**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Petitioner Frank Duane Welch, an Oklahoma state prisoner convicted of first

degree malice aforethought murder and sentenced to death, appeals the district court's

denial of his 28 U.S.C. § 2254 habeas petition. We exercise jurisdiction pursuant to 28

U.S.C. § 1291 and affirm.

I.

*Factual background*

The relevant underlying facts of this case were outlined in detail by the Oklahoma

Court of Criminal Appeals (OCCA) in addressing Welch's direct appeal:

> On February 25, 1987, Tracy Cooper arrived at his Norman home
> around 1:00 p.m. and found his wife, Jo Talley Cooper, lying dead in their
> living room. She was nude and had leather straps forming a ligature around
> her neck that also went down her back binding her hands. She had a piece
> of duct tape covering her mouth and one of her seven-month-old child's
> toys inserted in her vaginal area. The Coopers' seven-month-old child was
> unharmed and in his crib in his room.
>
> The physical and circumstantial evidence at trial supported the State's
> theory that [Welch] secured entry into the Coopers' home by posing as a
> Norman Cablevision employee [Welch was fired from his employment with
> Norman Cablevision prior to the day of the murder, but retained possession
> of his employee uniform] as there were no signs of forced entry and the
> Coopers' dogs were found secured in the garage, the location where Mrs.
> Cooper kept them when repairpersons were working who needed access to
> the backyard. After gaining secure entry, [Welch] bound Mrs. Cooper with
> leather straps and tightened the straps around her neck causing her death by
> ligature strangulation. [Welch] then raped Cooper, shoved a toy pylon into
> her vagina and left. The medical examiner testified Cooper's anal swab
> was positive for sperm and that she had perianal peri-postmortem tears
> which indicated the tears were sustained immediately after or during death.
> The medical examiner testified that Cooper had also sustained a
> peri-postmortem vaginal tear which was consistent with a trauma that could
> be caused by the insertion of a plastic toy like the one found in her vagina.
> The medical examiner also noted that Mrs. Cooper was approximately
> twelve weeks pregnant.

This case remained unsolved for approximately ten years until [Welch]'s name surfaced when his DNA was matched to a similar crime scene in the ten-year-old unsolved Debra Stevens homicide case in Grady County. Thereafter, Norman police detective, Steve Lucas, obtained a sample of [Welch]'s blood and had DNA testing performed. [Welch]'s DNA matched the DNA from sperm found on a towel at the Cooper home and charges were filed.

Welch v. State, 2 P.3d 356, 364-65 (Okla. Crim. App. 2000) (paragraph numbers omitted).

*Procedural background*

On February 25, 1997, Welch was charged by information in the District Court of Cleveland County, Oklahoma, with one count of first degree malice aforethought murder. On July 10, 1997, the State filed a bill of particulars alleging the existence of two aggravating factors: (1) that the murder was especially heinous, atrocious and cruel; and (2) the existence of a probability that Welch would commit criminal acts of violence that would constitute a continuing threat to society in the future.

The case proceeded to trial on March 23, 1998. At the conclusion of the first stage evidence, the jury found Welch guilty of first degree malice aforethought murder. At the conclusion of the second-stage evidence, the jury found the existence of the two aggravating factors alleged in the bill of particulars and recommended that Welch be sentenced to death. The trial court formally sentenced Welch on April 3, 1998, in accordance with the jury's recommendation.

Welch filed a direct appeal, and the OCCA affirmed his conviction and sentence on April 10, 2000. Welch, 2 P.3d at 377. Welch filed a petition for writ of certiorari with

the United States Supreme Court. That petition was denied by the Supreme Court on December 11, 2000. Welch v. Oklahoma, 531 U.S. 1056 (2000).

On March 27, 2000, while his direct appeal was still pending before the OCCA, Welch, in accordance with Oklahoma procedural rules, filed an application for post-conviction relief with the OCCA asserting seven propositions of error. The OCCA denied the application for post-conviction relief on May 25, 2000, in an unpublished opinion. Welch v. State, No. PCD-2000-86 (Okla. Crim. App. May 25, 2000).

Welch initiated this federal habeas action on April 16, 2001, by filing an application to proceed in forma pauperis and a request for appointment of counsel. Those requests were granted and, on December 10, 2001, Welch filed his federal habeas petition. On April 5, 2005, the district court denied Welch's petition in a written memorandum opinion. The district court subsequently granted Welch a certificate of appealability (COA) with respect to seven issues.

II.

Because Welch filed his federal habeas petition well after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), its provisions apply to this appeal. Malicoat v. Mullin, 426 F.3d 1241, 1246 (10th Cir. 2005). "Under AEDPA, the appropriate standard of review depends on whether a claim was decided on the merits in state court." McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "If the claim was not heard on the merits by the state courts, and the federal district court made its own determination in the first instance, we review the district court's conclusions of law de

-4-

novo and its findings of fact, if any, for clear error." Id. (internal quotation marks omitted). If, however, the claim was adjudicated on the merits by the state courts, the petitioner will be entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." McLuckie, 337 F.3d at 1197. "Rather, we must be convinced that the application was also objectively unreasonable." Id.

III.

*Admission of evidence relating to the murder of Debra Stevens*

Approximately one month prior to trial, the prosecution filed a notice stating that it intended to introduce at trial evidence that on or about May 6, 1987, in Grady County, Oklahoma, Welch forcibly raped and killed by means of strangulation a woman named Debra Anne Stevens. State ROA at 167. The notice alleged that evidence of Stevens murder would be offered "to establish motive and intent" and the "absence of mistake or accident" on the part of Welch. Id. The notice further alleged that evidence of Stevens murder "show[ed] a common scheme or plan, perpetration and criminal knowledge or intent." Id.

-5-

Although Welch objected to the introduction of this other crimes evidence, the trial court concluded that the evidence was relevant and admissible under Burks v. State, 594 P.2d 771 (Okla. Crim. App. 1979). In Burks, the OCCA held that "[e]vidence of other offenses may be admissible where it tends to establish motive, intent, absence of mistake or accident, identity or a common scheme or plan which embraces the commission of two or more crimes so related to each other that proof of one tends to establish the other." Id. at 772.

Consistent with the trial court's ruling, the prosecution proceeded to introduce, as part of its first stage case-in-chief against Welch, evidence regarding the Stevens murder. The first reference to the Stevens murder came during the direct examination of Stephen Lucas, a detective with the Norman Police Department. Lucas, who had been assigned as the primary investigator for the Cooper murder in November 1989, testified that in October 1996 the investigative team received a telephone call from Ed Briggs, an agent with the Oklahoma State Bureau of Investigation (OSBI). Briggs indicated that Welch had been identified as a suspect in the Stevens murder, which occurred in a similar fashion less than three months after the Cooper murder, and suggested that they look at Welch as a suspect in the Cooper murder. Following the tip from Briggs, Lucas testified that he obtained a blood sample from Welch and that the results of the DNA testing of that sample led to Welch being charged with the murder of Cooper. Lucas also testified that his investigation revealed that the two murders were similar in several respects. In particular, Lucas testified that each murder occurred the day after Welch appeared in

-6-

court on criminal charges. Further, Lucas testified that Stevens' body was found bound in a manner similar to that of Cooper's body, and that both bodies were positioned in a similar manner at the time of their discovery.

Following Lucas' testimony, the prosecution proceeded to introduce several witnesses who described the key details of the Stevens murder that were similar to those of the Cooper murder. Stacie Stromberg, the daughter of Debra Stevens, testified about discovering her mother's body in their home on May 6, 1987. According to Stromberg, her mother was lying face up on her bed with a rope around her neck. Stromberg also testified that she found the family dog, which normally had the run of the house, locked in her sister's room. Robert Lee, an OSBI agent who assisted in the investigation of the Stevens murder, testified that Stevens' naked body was found lying face-up with a small rope tied tightly around her neck, her hands bound tightly behind her with the same small gauge rope found around her neck, and white tissue or toilet paper stuffed in her mouth. Larry Balding, the deputy medical examiner who performed the autopsies on both victims, testified that Stevens died as a result of ligature strangulation, and that sperm was found in vaginal swabs taken from her body. Lastly, Mary Long, a criminalist with the OSBI, testified that she performed DNA testing on the sperm samples taken from Stevens' body, and that those samples matched the DNA found in a blood sample given by Welch.[1]

---

[1] Welch testified in his own defense and asserted that he and Stevens had been involved in a consensual affair. Welch further testified that he told Stevens about Cooper's death and that Stevens responded by threatening to tell the authorities unless

In these federal habeas proceedings, Welch contends the trial court's admission of evidence regarding the details of the Stevens murder violated his right to a fair trial and a reliable sentencing proceeding.[2] Welch first raised this issue on direct appeal. The OCCA rejected it, stating as follows:

> In his first proposition of error, [Welch] argues he was denied a fair trial by the admission of evidence that he murdered Debra Stevens in Grady County three months after Talley Cooper's death. He claims the introduction of this other crimes evidence did not fall within the exceptions of 12 O.S.1991, § 2404(B), forced him to defend against a collateral crime with which he was not charged, confused the issues and was nothing more than improper propensity evidence designed to prejudice him. Specifically, [Welch] alleges evidence of the Stevens murder was improperly admitted because: (1) the State's Burks notice was defective because the State failed to specify under which exception the evidence was sought to be admitted; (2) evidence of the Stevens murder was not necessary for the purposes cited by the State; (3) there was no visible connection between the Cooper and Stevens murders; (4) evidence of the Stevens murder was not necessary for the State to sustain its burden of proof; (5) the trial court's limiting instruction was defective because it failed to specify under which exception the evidence was being admitted; (6) the Stevens homicide was not part of the res gestae; and (7) evidence of the Stevens murder was more prejudicial than probative. The trial court consistently overruled [Welch]'s objections before the evidence was presented and throughout trial finding the evidence was relevant and that the probative value of the evidence outweighed its prejudicial effect. [Welch] was granted a continuing objection to all evidence and testimony of the Stevens murder.

---

Welch paid her ten thousand dollars. Lastly, Welch testified that he intentionally killed Stevens in response to her threat.

[2] In his opening appellate brief, Welch alleges that the admission of evidence regarding the Stevens murder violated his rights "under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution." Aplt. Br. at 30. Presumably, Welch is referring to "his right to a fair trial under the Sixth and Fourteenth Amendments and his Eighth Amendment right to an individualized jury determination as to whether the death penalty should be imposed." Malicoat, 426 F.3d at 1249.

Evidence of other crimes or bad acts is not admissible as proof of bad character to show a person acted in conformity therewith but "may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." 12 O.S.1991, § 2404(B). The reason other crimes evidence is so limited and its admission guarded revolves around fairness to the accused who should be convicted, if at all, by evidence of the charged offense and not by evidence of separate, albeit similar, offenses. Bryan v. State, 1997 OK CR 15, ¶ 33, 935 P.2d 338, 356, cert. denied, 522 U.S. 957, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997). To be admissible, evidence of uncharged offenses must be probative of a disputed issue of the crime charged, there must be a visible connection between the crimes, evidence of the other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s) must be clear and convincing, the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue contemporaneous and final limiting instructions. Bryan, 1997 OK CR 15, at ¶ 33, 935 P.2d at 356-57. When other crimes evidence is so prejudicial it denies a defendant his right to be tried only for the offense charged, or where its minimal relevancy suggests the possibility the evidence is being offered to show a defendant is acting in conformity with his true character, the evidence should be suppressed. Id.

[Welch] first attacks the Burks notice filed by the State because it failed to specify under which exception the evidence was sought to be admitted. [Welch] also attacks the trial court's limiting instructions alleging the same defect. Because [Welch] failed to object to the notice or the instructions, we will review for plain error. Wood v. State, 1998 OK CR 19, ¶ 35, 959 P.2d 1, 10. The record before this Court shows [Welch] was adequately apprised that the State intended to introduce evidence of the Stevens murder. At trial defense counsel conceded he received proper notice under Burks, but argued the evidence was irrelevant and prejudicial. In light of the evidence presented against [Welch] coupled with his own trial testimony, we find the failure to specify the section 2404(B) exception under which the evidence was sought to be admitted in the State's notice and in the trial court's instruction does not amount to plain error. However, we take this opportunity to remind trial judges and prosecutors of the importance of delineating the exception and purpose for which other crimes evidence is being offered. Specific rulings ensure fairness to the accused as well as facilitate expedient review of claims contesting admission of other crimes evidence.

The remainder of [Welch]'s complaints boil down to his assertion that the evidence of the Stevens murder did not fall within one of section 2404(B)'s exceptions and therefore the evidence was irrelevant, unnecessary and was more prejudicial than probative. Because [Welch] lodged timely objections on this basis, the claim is properly preserved for review. When such a claim is properly preserved as in the instant case, the State must show on appeal that admission of the other crimes evidence did not result in a miscarriage of justice or constitute a substantial violation of a constitutional or statutory right. Bryan, 1997 OK CR 15, at ¶ 33, 935 P.2d at 357.

In past cases, this Court has allowed evidence of other crimes or bad acts to be admitted under the "plan" exception of § 2404(B) where the methods of operation were so distinctive as to demonstrate a visible connection between the crimes. Aylor v. State, 1987 OK CR 190, ¶ 5, 742 P.2d 591, 593. In addressing the admissibility of such evidence, we have found it is relevant in determining the guilt or innocence of the accused when the peculiar method of operation is so unusual and distinctive as to be like a signature. Eberhart v. State, 1986 OK CR 160, ¶ 23, 727 P.2d 1374, 1379; Johnson v. State, 1985 OK CR 152, ¶ 4, 710 P.2d 119, 120; Driver v. State, 1981 OK CR 117, ¶ 5, 634 P.2d 760. Even though this Court has allowed such evidence under the "plan" exception, this exception is not the most accurate because it deals primarily with the admission of other crimes evidence to show the commission of one crime facilitated another. See Jones v. State, 1995 OK CR 34, ¶ 52, 899 P.2d 635, 649, cert. denied, 517 U.S. 1122, 116 S.Ct. 1357, 134 L.Ed.2d 524 (1996); Luna v. State, 1992 OK CR 26, ¶ 8, 829 P.2d 69, 72. However, in Eberhart, we recognized that distinctive methods of operation are relevant to prove the identity of the perpetrator of the crime. Eberhart, 1986 OK CR 160, at ¶ 23, 727 P.2d at 1379-80. Identity is the more appropriate label for such signature evidence because distinctive methods of operation are indicative of who perpetrated the crime.

In the instant case, one of the issues at trial was who killed Talley Cooper. In an effort to solidify its case against [Welch], the State introduced the Stevens homicide evidence with its similarities to prove to the jury that [Welch] was in fact the person who also killed Cooper. Contrary to [Welch]'s assertion, the similarities between the two murders were sufficiently distinctive to create a visible connection between the crimes making the Stevens homicide evidence probative of a disputed fact in [Welch]'s trial. The similarities include: (1) no signs of forced entry; (2)

each victim's house was adjacent to a large field; (3) the family dogs were locked inside rooms contrary to where the dogs were normally kept; (4) both murders occurred one day after [Welch] appeared in Cleveland County District Court; (5) both victims were white females who were raped and strangled in their own homes during daytime hours; (6) drawers had been opened suggesting a robbery although nothing was missing; (7) both women were gagged; (8) both victims were found nude, spread eagle, lying on their backs; and (9) both had ligatures around their necks which were similar with a loop forming a knot with the remaining cord/strap running through it.

Evidence of the Stevens murder also arguably fits within the absence of mistake or accident exception, notwithstanding [Welch]'s trial testimony. During opening statement, defense counsel stated that the State would not be able to show Mrs. Cooper's death was intentional. He routinely questioned witnesses about the lack of forced entry and the lack of any evidence of a struggle, suggesting Mrs. Cooper was expecting [Welch] and was a willing participant. Defense counsel also asked about the vaseline that was found at the scene and elicited that vaseline was sometimes used as a lubricant in consensual anal intercourse. Defense counsel elicited from the medical examiner that Mrs. Cooper's death could have been the result of autoerotic behavior. He also elicited from the DNA expert that DNA is the same whether it is the result of consensual or non-consensual conduct. This questioning was designed to suggest to the jury that Cooper's death could have equally been the result of an accident rather than an intentional murder as alleged by the State.

The more difficult questions to decide are whether the Stevens murder evidence was necessary to support the State's burden of proof and whether it was more probative than prejudicial. "In dealing with the relevancy of evidence, we begin with the presumption that in determining whether to admit such evidence, the trial judge should lean in favor of admission." Mayes v. State, 1994 OK CR 44, ¶ 77, 887 P.2d 1288, 1309-10, cert. denied, 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995). The party opposing its introduction has the burden to show it is substantially more prejudicial than probative. Mayes, 1994 OK CR 44, at ¶ 77, 887 P.2d at 1310. When balancing the relevancy of evidence against its prejudicial effect, the trial court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value. Id.

In the instant case, the State bore the burden to prove [Welch]

intentionally killed Cooper. As discussed above, this case remained unsolved for ten years until [Welch]'s name surfaced when his DNA was matched to the Stevens homicide case. The State's DNA evidence placed [Welch] at the Cooper residence and showed he had sex with Mrs. Cooper on the day of her death. It did not prove that he actually killed her. Evidence that [Welch] killed Stevens in an almost identical manner to Cooper bolstered the State's case that [Welch] killed Cooper. Further, evidence that [Welch] killed Stevens showed [Welch] intentionally killed Cooper and that her death was not an accident resulting from consensual autoerotic behavior. Despite its highly prejudicial nature, we find the probative value of the Stevens murder evidence outweighed its prejudicial effect and that the evidence was necessary to support the State's burden of proof. Finding the evidence properly admitted, this proposition is denied.

Welch, 2 P.3d at 365-67 (footnotes and paragraph numbers omitted).

Welch contends that we are not required to defer to the OCCA's ruling, and instead are free to apply a de novo standard of review, because the OCCA failed to cite to any federal cases in reaching its decision. Welch's contention, however, is contrary to the decision in Early v. Packer, 537 U.S. 3 (2002). In Packer, the Supreme Court held that a state court is not required to cite to, nor even be aware of, controlling Supreme Court precedent "so long as neither [its] reasoning nor the result of [its] decision contradicts" such precedent. Id. at 8; e.g., Gipson v. Jordan, 376 F.3d 1193, 1196 n.1 (10th Cir. 2004) (treating state court decision as an "adjudication on the merits," even though its reasoning was not expressly stated). Here, although the OCCA relied exclusively on its own precedent in resolving the issue, it is clear from the court's decision that it was aware that Welch was alleging a deprivation of his constitutional right to a fair trial. See Welch, 2 P.3d at 365 ("Appellant argues he was denied a fair trial by the admission of evidence that he murdered Debra Stevens . . . .").

-12-

Turning to the merits of the issue, Welch relies initially on <u>Michelson v. United States</u>, 335 U.S. 469 (1948), arguing that "[i]t is a fundamental truism in the law that an accused . . . must be convicted, if at all, based upon the evidence of the crime charged and not the character of the accused or his propensity to commit crimes." Aplt. Br. at 34. The problem for Welch, however, is that <u>Michelson</u> was a direct criminal appeal and dealt with the admissibility in a federal criminal proceeding of "evidence of a defendant's evil character to establish a probability of his guilt." 335 U.S. at 475. Further, the rules announced in <u>Michelson</u> regarding the admissibility of such evidence have been superseded by the enactment of Rule 405, Federal Rules of Evidence. <u>E.g.</u>, <u>United States v. Scholl</u>, 166 F.3d 964, 974 (9th Cir. 1999) (recognizing that <u>Michelson</u> has been superseded by rule). Thus, <u>Michelson</u> has no applicability to Welch's current appeal.

Welch does not cite to, nor does research reveal, any Supreme Court cases directly addressing the constitutionality of a trial court admitting evidence of a defendant's other crimes, particularly during the first or second stages of a capital murder case. Thus, Welch must rely on the more general principle that "the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair . . . ." <u>Payne v. Tennessee</u>, 501 U.S. 808, 825 (1991) (citing <u>Darden v. Wainwright</u>, 477 US. 168, 179-83 (1986)); <u>see</u> <u>also</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 69-70 (1991); <u>Knighton v. Mullin</u>, 293 F.3d 1165, 1170 (10th Cir. 2002) (applying similar principles in federal habeas proceeding). We have held that this standard will be satisfied only if "the probative value

-13-

of [the challenged] evidence is . . . greatly outweighed by the prejudice flowing from its admission . . . ." Knighton, 293 F.3d at 1171 (internal quotation marks omitted).

We conclude that the OCCA's rejection of Welch's claim on direct appeal is neither contrary to, nor an unreasonable application of, these general principles. To begin with, the Oklahoma cases and statutes applied by the OCCA are consistent with the constitutional principles outlined above, in that they acknowledge the prejudice associated with the admission of other crimes evidence and place strict limitations on the admission of such evidence. Welch, 2 P.3d at 365. Further, the OCCA reasonably concluded that evidence of the Stevens murder was relevant to prove that Welch was the perpetrator of the Cooper murder. As noted by the OCCA, both murders bore similar yet distinctive characteristics that strongly suggested they were committed by the same perpetrator. The OCCA also reasonably concluded that evidence of the Stevens murder was relevant to establish that Cooper's death was not the result of a mistake or accident. Although the evidence found at the Cooper crime scene strongly suggested that the death was the result of a crime and not a mistake or accident, evidence of the substantially similar Stevens murder, committed less than three months later, clearly removed any doubt as to the intentional nature of Cooper's death. Thus, the OCCA reasonably concluded that, "[d]espite [the] highly prejudicial nature" of the evidence regarding the Stevens murder, its "probative value . . . outweighed its prejudicial effect" and it "was necessary to support the State's burden of proof." Id. at 367.

It is also worth noting that both the prosecution and the trial court were careful to

explain to the jury the limited relevance of the challenged evidence. For example, during opening statements, the prosecution emphasized that Welch was "not [o]n trial for" the Stevens murder, and that evidence of the Stevens murder was "offered . . . for a limited purpose only." Vol. IV of Trial Tr. at 688. The prosecution also emphasized to the jury during opening statements that it would be asked "to examine the similarities between th[e] two crimes . . . ." Id. Prior to the introduction of evidence regarding the Stevens murder, the trial court read to the jury Oklahoma Uniform Jury Instruction CR-9-9, which explained to the jury the limited purpose of the evidence of other crimes. Id., Vol. V at 1011-12. Finally, during closing arguments, the prosecution, as noted in its opening statements, asked the jury to "[c]ompare the similarities between the [two] crimes" in determining whether Welch was guilty of intentionally killing Cooper. Id., Vol. VI at 1296.

In sum, we conclude the OCCA reasonably rejected Welch's assertion that admission of evidence regarding the Stevens murder violated his due process right to a fair trial.

*Improper testimony of two police officers during first stage proceedings*

Welch next asserts that "evidentiary harpoons" and "improper opinion testimony" delivered by prosecution witnesses Stephen Lucas and Robert Lee, both of whom were experienced police officers, violated his due process right to a fair trial. Welch first raised this issue on direct appeal. The OCCA rejected it on the merits:

In his second proposition, [Welch] alleges he was denied due process

-15-

and a fair trial by the admission of irrelevant and speculative opinion evidence and evidentiary harpoons. In particular, [Welch] complains about several opinions and statements made by Detective Steve Lucas and OSBI Agent Robert Lee.

[Welch] first complains that Detective Lucas' opinion, that the Coopers' dogs were put in the garage as part of a ruse to enter the house, was impermissibly speculative and unduly prejudicial. At trial, [Welch] objected to the initial question to elicit Lucas' opinion about the dogs on the ground of speculation. The trial court sustained the objection as to the "form of the answer" and stated that Lucas could give an opinion if he had one, but Lucas would not be allowed to state his suspicions or speculations. The prosecutor then asked Lucas if he had an opinion based on his analysis of the crime scene concerning the location of the dogs given the lack of forced entry. Lucas opined the dogs were in the garage as part of a ruse to enter the house. Because [Welch] did not object to this response, he has waived all but plain error. (citation omitted).

We find, based on our review of the record, that Detective Lucas' challenged testimony constituted a proper lay opinion based on his investigation. 12 O.S.1991, § 2701. Lucas testified that he took over the Cooper homicide investigation in November 1989, some two and half years after the crime. In order to familiarize himself with the case, he read all the police reports along with the witnesses' statements as well as reviewed the physical evidence. He then re-interviewed family members and friends in an effort to generate relevant leads. Family members testified that the dogs were usually in the backyard unless a repairperson was there and needed access to the backyard. [Welch]'s ex-wife testified that [Welch] still had his Norman Cablevision uniforms when Cooper was killed. Lucas' opinion was rationally based on his perceptions following his investigation which aided the jury in its determination of a fact in issue. Accordingly, the opinion was proper and did not amount to error, much less plain error.

Second, [Welch] complains about Detective Lucas' statement that both the Cooper and Stevens homicides occurred the day after [Welch] appeared in court. As the State points out, the statement constitutes factual testimony rather than opinion. Further, there is nothing speculative about it. It is simply a factual statement properly admitted to show another similarity between the two crimes in an effort to establish [Welch] as the perpetrator of the Cooper homicide. 12 O.S.1991, § 2404(B). Such evidence was more probative than prejudicial. 12 O.S.1991, § 2403.

Next, [Welch] complains that Detective Lucas injected irrelevant and speculative evidence into the trial when he described the manner in which Talley Cooper's hands were bound. Lucas described the bindings as "it's got a large slipknot almost on one hand that's pulled tight and then wrapped in, oh, half-inch cattle--like calf roping-type thing." [Welch] claims Lucas used the calf roping description in an effort to unfairly incriminate him after he told Lucas during an interview that he had been involved in rodeos and owned livestock. [Welch] also attacks Lucas' testimony that the leather straps used to bind Talley Cooper were scrap leather known as "farmer's bundles" which Lucas said were sold at saddle and boot shops. He maintains this testimony allowed Lucas "to improperly imply that [Welch], as a rodeo veteran, had tied up Talley Cooper like livestock." (citation omitted). Contrary to [Welch]'s claim, this testimony was neither speculative nor irrelevant opinion evidence. Lucas merely described his personal observations of how the victim's hands were tied using the calf-roping reference to explain what he saw. Moreover Lucas described his investigation that uncovered the fact that the straps were scrap leather known as "farmer's bundles." Accordingly, we find the admission of this testimony was not error.

Fourth, [Welch] maintains Lucas improperly invaded the province of the jury when he testified Cooper's death was not self-inflicted or the result of autoerotic behavior, that her death was not accidental but intentionally inflicted and that Cooper's wounds were not consistent with sexual asphyxiation. In Romano v. State, 1995 OK CR 74, ¶ 21, 909 P.2d 92, 109, cert. denied, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996), we addressed the propriety of opinion evidence on ultimate issues and stated:

> Opinion evidence on ultimate issues is generally admissible. 12 O.S.1991, § 2704. However, the "otherwise admissible" language of § 2704 must be read in context with 12 O.S.1991, §§ 2403, 2701, 2702. While expert witnesses can suggest the inferences which jurors should draw from the application of specialized knowledge to the facts, opinion testimony which merely tells a jury what result to reach is inadmissible. (citations and footnotes omitted)

See also Cannon v. State, 1998 OK CR 28, ¶ 18, 961 P.2d 838, 846.

In the instant case, the prosecutor did not formally qualify Detective Lucas as an expert by asking the trial court to recognize him as such. However, the prosecutor qualified Lucas to render certain opinions after

-17-

asking him about his sixteen year career as a police officer and his specialized training in sexual asphyxiation deaths. Thereafter during questioning, the prosecutor asked Lucas if he attached any significance to his analysis of Mrs. Cooper's injuries given his training. Lucas testified Cooper's injuries were intentionally inflicted and were not accidental, self-inflicted or the result of autoerotic behavior. The trial court sustained defense counsel's objection to Lucas' opinion after the prosecutor offered to rephrase the question. Lucas then explained that in sexual asphyxiation cases, the participants pad the noose device so no marks are left on the neck. Further, the participants employ an escape mechanism in case of distress so they will not die. Lucas testified these common attributes he learned of in training were not present in the instant case.

A review of the record shows Lucas' opinion was not improper opinion testimony on an ultimate issue since it did not tell the jury what result to reach. Lucas' testimony was based upon his examination and investigation of the crime scene coupled with his training. In his testimony Lucas described his in depth investigation and review of police reports, witnesses' statements and numerous photographs of the crime scene. Lucas then told the prosecutor that the physical evidence was not consistent with consensual behavior. At no time did Lucas say that [Welch] intentionally killed Cooper; rather, he testified Cooper's bindings that resulted in her death were not consistent with consensual autoerotic behavior based on his specialized knowledge in homicide investigation. As this was proper opinion testimony, no error occurred in its admission.

In [Welch]'s final complaint about Detective Lucas, he claims Lucas intentionally injected an evidentiary harpoon when he testified that [Welch] told him he had participated in rodeos not only during childhood, but while in prison. As the trial court found, [Welch] was not prejudiced by this reference to other crimes/prison. As part of his defense against imposition of the death penalty, defense counsel advised the jury in opening statement that [Welch] was serving a life sentence plus consecutive forty-five and twenty year sentences in an effort to show the jury [Welch] was not a continuing threat because he would never be in society again. To bolster his credibility, [Welch] detailed his many prior convictions during his testimony maintaining he accepted responsibility when he was in fact guilty. Given this evidence, we find that Lucas' reference to prison had no impact on the verdict or sentence.

Lastly, [Welch] claims he was prejudiced by an evidentiary harpoon

willfully launched by OSBI Agent Robert Lee. Agent Lee testified that [Welch] was investigated in connection with the Stevens homicide because they received information that [Welch] had left the Grady County area abruptly after the crime, that [Welch] and his former wife were friends with the Stevens and lived in property adjoining or close to them and that [Welch] had raped his former wife prior to their marriage and liked to tie her up during sex. The trial court overruled [Welch]'s objection and denied his motion for mistrial to the latter portion of Lee's answer finding such evidence was not prejudicial in light of the properly admitted other crimes evidence. However, the trial court did offer to admonish the jury since the evidence was irrelevant. Initially, defense counsel refused any admonition claiming it would only serve to emphasize the improper evidence and could not cure the error. Following a lunch break and additional discussion, defense counsel acceded to having the jury admonished. Thereafter, the trial court advised the jury there was no evidence to support Lee's statement that [Welch] had raped his former wife and that such statement should be disregarded and not considered.

This Court has consistently held that when inadmissible evidence or an improper comment is presented to a jury, an admonishment to the jury by the court that the evidence or comment is not to be considered will cure any error. (citations omitted). Here, the admonishment given to the jury was sufficient to cure any error, even though the admonition failed to specifically address Lee's statement that [Welch] liked to tie up his former wife during sex. A review of the record shows that such remark was not verdict or sentence determinative given the strong evidence against [Welch]. Accordingly, this proposition of error is denied.

Welch, 2 P.3d at 367-70 (paragraph numbers omitted).

Welch suggests that the OCCA "did not address squarely his *federal* constitutional claims concerning these issues," Aplt. Br. at 44 n.9 (italics in original), and thus he contends we are free to apply a de novo standard of review. Welch is clearly mistaken. As noted above, the OCCA expressly acknowledged at the outset of its discussion that Welch was alleging a denial of "due process and a fair trial . . . ." Welch, 2 P.3d at 367. Although the OCCA relied largely on its own precedent in addressing Welch's claims,

-19-

that does not mean that it failed to address the merits of his federal due process claim.

Rather, as previously noted, our only concern is that its reasoning and result are consistent

with controlling Supreme Court precedent.  See Packer, 537 U.S. at 8.

As with his challenge to the admission of evidence regarding the Stevens murder,

Welch's constitutional challenge to the testimony of Lucas and Lee is governed by the

general principle that "the Due Process Clause of the Fourteenth Amendment provides a

mechanism for relief" when "evidence is introduced that is so unduly prejudicial that it

renders the trial fundamentally unfair . . . ."  Payne, 501 U.S. at 825.

*a) Detective Lucas' testimony*

In discussing Lucas' testimony, Welch focuses primarily on Lucas' statement, in

response to cross-examination by defense counsel regarding Welch's experience with

rodeos, that Welch indicated he had participated in rodeos not only while growing up but

also "while in prison."[3]  Trial Tr., Vol. V at 930.  Both the trial court and the OCCA,

however, concluded that Lucas' statement was not prejudicial because Welch's defense

counsel had informed the jury during opening statements that Welch was serving a

significant term of imprisonment.  Welch attempts to side-step these holdings by asserting

that he "clearly suffered extreme prejudice from both the harpoon and his [trial] counsel's

inexplicable decision to open that door [i.e., telling the jury that Welch was serving time

---

[3] As indicated in the OCCA's decision, evidence of Welch's rodeo experience was relevant in two respects.  First, the manner in which Cooper's hands were bound was allegedly similar to that used by participants in the rodeo event of calf-roping.  Second, the leather strips used to bind Cooper were alleged to be similar to scrap leather often sold by saddle and boot shops for use in saddle and bridle repair.

in prison] prior to the conclusion of the State's case."[4]  Aplt. Br. at 51-52.  In other words,

Welch argues that "if trial counsel had been minimally effective and sought to restrict the

use of such priors under state law then such a harpoon would have been overwhelmingly

prejudicial and resulted in reversal."  Id. at 52.  The problem for Welch, however, is that

he did not assert these ineffective assistance arguments before the OCCA at the time of

his direct appeal or in his application for post-conviction relief.  Rather, he focused

exclusively on the propriety of Lucas' statement.  Thus, he is now precluded from

asserting any type of ineffective assistance of counsel claim in this appeal (even if the

purpose of that claim is, as it appears, to bolster his claim regarding the admission of

Lucas' testimony).

Welch also argues that Lucas "injected several ideas that, while perhaps falling

short of evidentiary harpoons, nevertheless were extremely prejudicial within the context

of the entire trial."  Aplt. Br. at 50 n.11.  According to Welch, "[t]hese include: 1)

hypothesizing why the dogs were found in the garage at the Cooper residence (he

speculated that in his opinion it was 'part of a ruse to enter the house'); 2) attaching

'significance' that the deaths of both Cooper and Stevens occurred the day after a court

appearance by Welch; and 3) giving his opinion that the wounds on Cooper were not the

result of autoerotic asphyxiation as claimed by Welch, but rather were 'intentionally

inflicted.'"  Id.

_____

[4] Welch all but concedes in his opening brief that Lucas' statement was not prejudicial in light of the fact that defense counsel informed the jury that Welch was serving time in prison.  See Aplt. Br. at 51.

We conclude the OCCA reasonably rejected all three of these arguments. With respect to Lucas opining as to why the Coopers' dogs were found in the garage (rather than outside where they were normally kept), the OCCA concluded this was admissible lay opinion testimony because it "was rationally based on [Lucas'] perceptions following his investigation," and it "aided the jury in its determination of a fact in issue." Welch, 2 P.3d at 368. With respect to Lucas' testimony that each of the two murders occurred the day after Welch appeared in court, the OCCA concluded this was "simply a factual statement properly admitted to show another similarity between the two crimes in an effort to establish [Welch] as the perpetrator of the Cooper homicide." Id. at 368. Finally, with respect to Lucas opining that Cooper's wounds were not consistent with consensual sexual asphyxiation, the OCCA concluded it was properly admitted because it "was based upon his examination and investigation of the crime scene coupled with his training" and "did not tell the jury what result to reach." Id. at 369. Notably, Welch makes no attempt in this appeal to explain why any of these conclusions reached by the OCCA were erroneous.

Finally, even assuming for purposes of argument that these pieces of testimony should not have been admitted, a review of the transcript of Welch's trial indicates that, given the strength of the prosecution's case against Welch, the admission of these statements by Lucas did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)) (outlining harmless error

test to be utilized in federal habeas proceedings).

b) Agent Lee's testimony

Welch complains, as he did on direct appeal, about the following statement (which he characterizes as an "evidentiary harpoon") given by Agent Lee in response to the prosecution's question about how his investigation of the Stevens murder led him to Welch:

> Initially, we received information that Frank Welch had left the Tuttle [Oklahoma] area abruptly after Stevens' death. And the other information we received concerning Frank was that he and his wife at the time, Bonnie, had been close friends of the Stevens, that they lived on property that was adjacent to or butted up to the Stevens' property. *Also that Frank liked to tie up Bonnie during sex, and that prior to their marriage, that Frank had raped Bonnie.*

Trial Tr., Vol. V at 1031 (emphasis added).

As noted, the OCCA concluded that the admonishment given by the trial court to the jury regarding Lee's remark "was sufficient to cure any error, even though the admonition failed to specifically address Lee's statement that [Welch] liked to tie up his former wife during sex." Welch, 2 P.3d at 370. In the OCCA's view, "[a] review of the record show[ed] that such remark was not verdict or sentence determinative given the strong evidence against [Welch]." Id.

Welch contends that the OCCA's determination was "an unreasonable application of the law and of the facts because the nature of the harpoons by Agent Lee clearly prejudiced Welch to a tremendous degree resulting in a fundamentally unfair trial." Aplt. Br. at 49. More specifically, Welch asserts that Lee's statements had a "devastating

effect" because "Lee was an experienced law enforcement officer" who, "under oath, . . . basically called Welch a rapist and a participant in kinky sex . . . ." Id. Welch further asserts that his trial counsel "was absolutely correct in arguing that a curative instruction could not assuage the . . . effect of these harpoons," id., and "the conclusion of the [OCCA] to the contrary must result in habeas relief." Id. at 50.

In determining the merits of Welch's arguments, we begin by analyzing the evidence that was presented at trial. During its case-in-chief, the prosecution presented evidence that strongly, if not overwhelmingly, established that Cooper was the victim of a violent and intentional attack. More specifically, the prosecution's evidence established that:

* Cooper's mouth was covered with layers of duct tape, the sticky side of which contained some blood, suggesting the tape may have been placed on her mouth and lips in an aggressive manner;

* Cooper's neck was tightly bound with two leather ligatures, under which were blisters or abrasions where the skin had been scraped off (prior to, rather than after, her death);

* Cooper's eyes, face and neck area displayed petechial hemorrhages (i.e., fine pinpoint areas where small blood vessels had been broken), consistent with ligature strangulation;

* both of Cooper's wrists were bound tightly behind her back (with the leather ligatures running from her neck directly to her hands), leaving ligature marks on both wrists (particularly the right wrist, on which the ligature was bound so tightly that the coroner had to cut it off);

* Cooper had "parchment abrasions" on the front of both of her shoulders, likely the result of being pushed or dragged on the carpet, that were incurred after she was dead or while she was in the process of dying (because the abrasions didn't hemorrhage or bleed);

-24-

* very small tears were found in Cooper's perianal area that were likely incurred after Cooper was dead (because they showed no evidence of bleeding or hemorrhage);

* sperm was found in swabs taken from Cooper's anus (suggesting, along with the presence of the perianal tears, that she was anally raped while she was dying or after she had died); and

* approximately two to four inches inside of Cooper's external vaginal opening was a laceration approximately an inch long, that was likely incurred after her death (perhaps as a result of the toy pylon being placed in her vagina).

The government's evidence also established that Welch, while employed with Norman Cablevision, performed a service call to the Cooper's home in December 1986, little more than two months prior to the murder. Further, the government's evidence established that Welch was fired from his job with Norman Cablevision in January 1987 for destroying original work records, but retained his uniforms for at least two months thereafter. Finally, as part of its case-in-chief, the government presented testimony from a forensic serologist who testified that he performed DNA analysis on sperm samples taken from a kitchen towel found laying near Cooper's body and that the DNA found in those samples matched the DNA in the known sample of Welch's blood. The forensic serologist further testified that the DNA profile found in the semen samples occurs one time in 5.2 million males in the general population, thus making it extremely unlikely that a male other than Welch was responsible for the semen samples found on the towel.

Welch testified in his own defense during the first stage proceedings and attempted to rebut or explain away all of the damning evidence presented by the prosecution. To

begin with, Welch denied ever raping or tying up his ex-wife Bonnie. As for his connection with Talley Cooper, Welch admitted making a service call to her home in December 1986 and testified that, during the course of that service call, he asked Talley Cooper "if she fooled around," to which she allegedly responded "yes" and provided him with her phone number. Welch further testified that in early 1997, prior to Talley Cooper's death, he visited her house on two occasions and had consensual sex with her. As for the day of Cooper's murder, Welch admitted that he had been in Cooper's house (although he initially told police that he did not know Talley Cooper at all) and testified that they first, at Cooper's urging, had consensual anal intercourse, and then, at his suggestion, tried the "asphyxiation deal" he had read about in pornographic magazines. Welch testified that Cooper collapsed to the floor and died while they were engaged in sex, and that he panicked and decided to try and make it look like somebody had attacked her. Thus, Welch testified, he put the duct tape over her mouth, wrapped the leather cord tightly around her neck and tied it off, and placed the toy in her vagina (he "figured the weirder it looked the better it would be").

The prosecution presented several key pieces of evidence in rebuttal. In particular, the coroner who performed the autopsy on Cooper testified that the perianal tears he found on her body were inconsistent with Welch's story, in that they occurred after she died or while she was in the process of dying. In addition, Katherine Roberts, a close friend of Cooper's, testified that several weeks prior to the murder, Cooper called and said "something weird" had happened and she was feeling scared. According to Roberts,

Cooper told her that a "greasy-looking" man had come to her house to look at her cable television system and that, when he entered the house, he followed her "real close" and seemed more interested in following and talking to her than working.[5]

Considering all of this evidence together, as well as the fact that the trial court admonished the jury not to consider Lee's statement that Welch had raped his ex-wife, we agree with the OCCA that Lee's statements did not violate Welch's due process right to a fair trial. Applying the AEDPA standards of review, we therefore conclude that the OCCA's rejection of Welch's due process claim was neither contrary to, or an unreasonable application of, the general constitutional principles previously outlined.

*Admission of hearsay evidence during first stage proceedings*

Welch contends that the trial court violated his constitutional right to confront and cross-examine witnesses against him when it admitted, during the prosecution's first stage case in rebuttal, hearsay testimony from Katherine Roberts, a friend of Talley Cooper's, regarding a conversation she had with Cooper several weeks prior to her death. As noted, Roberts testified that Cooper related to her a "weird" incident involving a male cable employee who came to her home and then proceeded to follow her closely, effectively scaring her and giving her "the creeps."

Welch first raised this issue on direct appeal. The OCCA rejected it, stating as

_____

[5] The prosecution also presented two other witnesses, one of whom testified with regard to the investigation of the Stevens murder and the other, a woman named Paige Hora, who testified that on the morning of October 8, 1994, in the parking lot of the Wal-Mart store in Tulsa, Oklahoma, where she worked, she was attacked by Welch, who she did not know, with a large knife.

follows:

    In his third proposition of error, [Welch] claims he was denied a fair trial and his right to confront witnesses against him by the admission of prejudicial hearsay evidence whose probative value was questionable and whose reliability was suspect. In rebuttal, Katherine Roberts testified she received a telephone call from her friend, Talley Cooper, several weeks before her death. Cooper told Roberts that a man had come to her house to look at her cable who followed her very closely and seemed more interested in following and talking to her than in looking at the cable. Cooper told Roberts that he scared her and gave her the "creeps." Cooper described the man as greasy-looking and dirty.

    The trial court correctly allowed Cooper's statement that the cableman scared her and gave her the "creeps" under the state of mind exception to the hearsay rule. 12 O.S.1991, § 2803(3). Such antecedent declarations by a decedent are admissible in a homicide case to show the decedent's state of mind toward the defendant or to supply the motive for killing. Moore v. State, 1988 OK CR 176, ¶ 18, 761 P.2d 866, 870. Here, although Cooper did not identify [Welch] as the cableman, [Welch] testified he met Cooper several weeks before her death when he responded to a service call thereby supplying that fact. The testimony concerning Cooper's apprehension of [Welch] provided an insight into her state of mind especially in light of [Welch]'s claim that after his initial service call he and Cooper started a consensual extramarital affair and that her death was an accident. See Moss v. State, 1994 OK CR 80, ¶ 40, 888 P.2d 509, 519; Hooker v. State, 1994 OK CR 75, ¶ 27, 887 P.2d 1351, 1360, cert. denied, 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995).

    However, the remainder of the statement that [Welch] came to her home to look at the cable, followed her around and seemed more interested in her than in looking at the cable does not go to Cooper's state of mind. The State concedes this part of the statement touches on [Welch]'s past acts which is generally inadmissible, but argues such testimony was necessary to establish the reliability of Cooper's statement to Roberts and to establish that [Welch] was the cableman to which Cooper referred. These references to [Welch]'s past acts were not necessary to establish reliability or identity in light of [Welch]'s testimony. Therefore, that part of the statement should have been excluded. However, because we find beyond a reasonable doubt that this error did not contribute to the verdict or sentence, this error is harmless and relief is not warranted. Hooker, 1994 OK CR 75, at ¶ 28, 887

-28-

P.2d at 1360.

Welch, 2 P.3d at 370.

Although Welch acknowledges that the OCCA addressed the issue, he argues that, because the OCCA "failed to cite or discuss controlling, or for that matter, any federal authority," the OCCA "did not expressly adjudicate [his] constitutional claim[] on the merits," and that we are therefore free to review the claim de novo. Aplt. Br. at 54. We disagree. In addressing the issue, the OCCA expressly noted that Welch was claiming a violation of his constitutional right to confrontation. Further, as previously noted, the Supreme Court has held that a state court is not required to cite to, nor even be aware of, controlling Supreme Court cases, "so long as neither [its] reasoning nor the result of [its] decision contradicts" controlling Supreme Court precedent. Packer, 537 U.S. at 8. Thus, we are bound to apply the deferential AEDPA standards in reviewing this claim.

Turning to the merits of Welch's claim, "[t]he Sixth Amendment's Confrontation Clause, made applicable to the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" Ohio v. Roberts, 448 U.S. 56, 62-63 (1980) (internal citations omitted). That right, however, "does not bar admission of an unavailable witness's statement against a criminal defendant if the statement bears adequate indicia of reliability." Crawford v. Washington, 541 U.S. 36, 40 (2004) (internal quotation marks omitted) (citing Roberts, 448 U.S. at 66). "To meet that test, evidence must either fall within a 'firmly rooted hearsay exception' or bear 'particularized guarantees of

trustworthiness.'" Id. (quoting Roberts, 448 U.S. at 66).[6]

Here, the OCCA, in concluding the trial court properly admitted Roberts' testimony regarding Cooper's statements to her that the cableman scared her and gave her the "creeps," relied on a "firmly rooted hearsay exception" under Oklahoma law, i.e., "the state of mind exception to the hearsay rule." Welch, 2 P.3d at 370; see Moore v. Reynolds, 153 F.3d 1086, 1107 (10th Cir. 1998) (holding, in federal habeas case brought by Oklahoma capital defendant, that Oklahoma's state of mind exception to the hearsay rule satisfies the reliability requirement of Roberts). Thus, the OCCA's ruling with respect to this aspect of Roberts' testimony was neither contrary to, nor an unreasonable application of, controlling Supreme Court precedent. Further, even assuming, for purposes of argument, that this aspect of Roberts' testimony should not have been admitted, its admission was harmless. More specifically, given the strength of the prosecution's evidence, we conclude that Roberts' testimony did not have a "'substantial and injurious effect or influence in determining the jury's [first stage] verdict.'"[7] Brecht,

---

[6] Although the Supreme Court in Crawford rejected certain of the statements in Roberts, those aspects of Crawford are inapplicable here because the decision was issued long after the OCCA decided Welch's direct appeal.

[7] Welch argues that Roberts' testimony was "*crucial* to the State's case" against him. Aplt. Br. at 63 (italics in original). More specifically, Welch argues that, without Roberts' statements, "the State would have been left with only the DNA evidence which proves merely that Welch may have been at the scene at one time and had intercourse with Cooper at some point in time . . . ." Id. A review of the trial transcript, however, clearly refutes these arguments. As previously discussed, the prosecution's evidence against Welch was extremely strong, if not overwhelming, and Roberts' testimony, which came during the prosecution's rebuttal case, was clearly not crucial to the outcome of the trial.

507 U.S. at 623 (quoting Kotteakos, 328 U.S. at 776).

As for the remaining portions of Roberts' testimony (concerning the acts of the cableman while in Cooper's home), the OCCA concluded that they were improperly admitted, but that the resulting error was harmless beyond a reasonable doubt. Again, given the strength of the government's first stage evidence, we conclude that the OCCA's decision in this regard was neither contrary to, nor an unreasonable application of, the harmless-beyond-a-reasonable-doubt standard announced in Chapman v. California, 386 U.S. 18, 24 (1967).[8]

*Refusal of trial court judge to recuse*

Welch contends he was deprived of his right to a fair trial and a fair tribunal due to the failure of the trial judge, Honorable Tom A. Lucas, to sua sponte recuse in light of the fact that one of the lead detectives in the case, Norman police officer Stephen Lucas, was the trial judge's son. Welch first raised this issue on direct appeal. The OCCA concluded the issue had been waived by Welch prior to trial:

> In his fifth proposition of error, [Welch] claims the trial judge erred in failing to recuse sua sponte from the instant case because the judge's son was the primary case agent and a key prosecution witness. [Welch] maintains that by presiding over a case in which his son was a crucial, material witness for the State, the trial judge was unavoidably biased thereby creating a structural defect not subject to waiver or harmless error

---

[8] Although the OCCA did not cite to Chapman or expressly refer to a "harmless beyond a reasonable doubt" standard, it cited to its prior decision in Hooker v. State, 887 P.2d 1351, 1360 (Okla. Crim. App. 1994), in which such a standard was expressly discussed. Welch, 2 P.3d at 370. Even assuming, arguendo, that the OCCA did not apply the proper harmless error standard, the error would be considered harmless under the standard outlined in Brecht.

analysis. To support his claim the trial judge was biased, [Welch] avers he was prejudiced by the evidentiary rulings during Detective Lucas' testimony as argued in his second proposition of error. (footnote omitted stating: "The record shows that the jurors were not apprised of the relationship between the trial judge and the witness.").

"The Oklahoma Constitution guarantees a defendant a right to a fair, impartial trial not tainted by the personal bias or prejudice of the trial court." Fitzgerald v. State, 1998 OK CR 68, ¶ 10, 972 P.2d 1157, 1163. The decision of a trial judge to disqualify herself from hearing a criminal case is within the sound discretion of that judge whose decision will not be disturbed on appeal unless abuse of that discretion is shown. Id. A defendant asserting a claim that the trial judge was biased and abused her discretion must show the trial court harbored prejudice against him which materially affected his rights at trial and that he was prejudiced by the trial court's actions. Id. However, "the right to preclude a disqualified judge from trial is a personal privilege which can be waived" by the failure to strictly comply with the proper procedure for seeking the disqualification of the trial judge. See Hatch v. State, 1983 OK CR 47, ¶ 5, 662 P.2d 1377, 1380, cert. denied, 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986); Willis v. State, 1982 OK CR 134, ¶ 4, 650 P.2d 873, 874.

During a pre-trial hearing, the trial judge advised the parties that his son was one of the detectives in this case. Both defense counsel and [Welch] stated on the record they did not have any objection to the trial judge presiding over the trial. Following the pre-trial hearing, neither defense counsel nor [Welch] sought to have the trial judge disqualified pursuant to 20 O.S.1991, § 1403.

This case is similar to Smith v. State, 1987 OK CR 94, ¶ 5, 737 P.2d 1206, 1209, cert. denied, 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987), also a capital case, in which the appellant alleged prejudice on appeal because the preliminary hearing magistrate was the brother of the prosecuting attorney. The Smith court found the appellant and his defense counsel expressly waived any conflict in open court and the appellant did not show why the waiver would be invalid. Smith, 1987 OK CR 94, at ¶ 6, 737 P.2d at 1209. An examination of the record herein reveals [Welch] and defense counsel affirmatively waived any conflict by so stating on the record and by failing to follow the mandated procedures for seeking a trial judge's disqualification. Hatch, 1983 OK CR 47, at ¶ 5, 662 P.2d at 1380; Willis, 1982 OK CR 134, at ¶ 4, 650 P.2d at 874. Even if we were to indulge [Welch] and find he did not waive his right, he could not prevail

-32-

because he cannot show the trial court harbored prejudice against him. See Proposition II, supra. Accordingly, this proposition is denied. (footnote omitted stating: "Because the scrutiny is higher in death penalty cases as a death sentence is qualitatively different from other punishments, we recommend trial judges recuse when a familial relationship exists between the judge and a witness so as to avoid any appearance of partiality.").

Welch, 2 P.3d at 372-73 (paragraph numbers omitted).

Welch again contends that we are not bound to defer to the OCCA's ruling under the AEDPA standards of review because, in his view, the OCCA did not address the merits of his federal constitutional claim. In support of his contention, Welch notes that the OCCA did not "cite or discuss controlling, or for that matter any, federal authority," and instead "appears to have **explicitly and solely** relied upon the Oklahoma State Constitution in analyzing this claim . . . ." Aplt. Br. at 65 (emphasis in original). For the reasons discussed in connection with Welch's first three arguments, we again disagree. Although the OCCA relied on the Oklahoma Constitution and its own precedents in addressing Welch's claim, that does not mean that it failed to address the merits of his federal due process claim. Rather, as previously noted, our only concern is that the OCCA's reasoning and result are consistent with controlling Supreme Court precedent. See Packer, 537 U.S. at 8. Moreover, as discussed below, the OCCA concluded, and reasonably so, that Welch expressly waived the issue prior to trial.

The Supreme Court has long held that it is a violation of due process for a criminal defendant to be tried by a judge who "has a direct, personal, substantial pecuniary interest in reaching a conclusion against [the defendant] in his case." Tumey v. Ohio, 273 U.S. 51, 523 (1927). In other words, "the Due Process Clause of the Fourteenth Amendment

-33-

establishes a constitutional floor" regarding a trial judge's qualifications to hear a case, Bracy v. Gramley, 520 U.S. 899, 904 (1997), and requires that the trial judge have "no actual bias against the defendant or interest in the outcome of his particular case." Id. at 905.

Here, although Welch argued on direct appeal, and continues to insist in this federal habeas appeal, that the trial judge in his case exhibited actual bias, there is simply no basis for reaching such a conclusion. To begin with, it is clear from reviewing the trial transcript that, as determined by the OCCA, Welch and his defense counsel expressly stated on the record that they had no objection to the trial judge presiding over the trial, notwithstanding his relationship to Detective Lucas. Consistent with those express statements, neither Welch nor his defense counsel made any mention of actual bias before or during the trial. Thus, the OCCA reasonably concluded that Welch "affirmatively waived any conflict by so stating on the record and by failing to follow the mandated procedures for seeking a trial judge's disqualification." Welch, 2 P.3d at 372.

Even absent Welch's waiver, the mere fact that the lead investigator, and consequently a key witness, in the case was the trial judge's son did not mean that the trial judge had a personal interest in the outcome of the case. See Dyas v. Lockhart, 771 F.2d 1144, 1146 (8th Cir. 1985) (concluding that judge who presided over criminal trial in which the prosecuting attorney was the judge's nephew, the two deputy prosecuting attorneys were the judge's brother and son, and the court reporter was the judge's wife, did not have a personal interest in the outcome of the trial). Moreover, for the reasons

previously discussed, we conclude the trial judge properly admitted the challenged portions of his son's testimony. And, even assuming those evidentiary rulings were wrong, that, standing alone, would not be enough to establish actual bias. See Liteky v. United States, 510 U.S. 540, 555 (1994) (holding that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion."). Thus, in sum, it is clear "that any biasing influence from the circumstances here was too remote and insubstantial to create a presumption [or even a reasonable likelihood] of bias." Fero v. Kerby, 39 F.3d 1462, 1480 (10th Cir. 1994); see generally Withrow v. Larkin, 421 U.S. 35, 47 (1975) (noting "that the probability of actual bias on the part of the judge is too high to be constitutionally tolerable" in cases where "the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him").

That leaves only Welch's claim that the trial judge should have sua sponte recused himself on the basis of the appearance of bias. Unlike its firm stance on the constitutional impermissibility of a biased judge presiding over a criminal trial, the Supreme Court has not directly addressed a criminal case involving the appearance of bias on the part of the trial judge. To be sure, the Supreme Court has, on occasion and in dicta, suggested that something less than actual bias can result in a violation of due process. E.g., Taylor v. Hayes, 418 U.S. 488, 501 (1974) ("the inquiry must be not only whether there was actual bias on [the judge's] part, but also whether there was such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the

interests of the court and the interests of the accused") (internal quotation marks and citation omitted); In re Murchison, 349 U.S. 133, 136 (1955) (noting that "our system of law has always endeavored to prevent even the probability of unfairness" and that this "stringent rule may sometimes bar trial by judges who have no actual bias"). Those references, however, appear to pertain to situations in which the circumstances are sufficient to give rise to a presumption or reasonable probability of bias. Thus, as the Third Circuit recently concluded, these cases cannot reasonably be read as "stand[ing] for the conclusion . . . that a judge with an appearance of bias, without more, is required to recuse himself sua sponte under the Due Process Clause." Johnson v. Carroll, 369 F.3d 253, 260 (3d Cir. 2004) (rejecting, in context of federal habeas proceedings, state prisoner's claim of bias on the part of trial judge); see also Del Vecchio v. Illinois Dept. of Corrections, 31 F.3d 1363, 1371 (7th Cir. 1994) (en banc) (rejecting the notion that an appearance of bias on the part of a trial judge amounted to a due process violation); see generally Bracy, 520 U.S. at 904 (noting that "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard."). "Because the Supreme Court's case law has not held, not even in dicta, let alone 'clearly established,' that the mere appearance of bias on the part of a state trial judge, without more, violates the Due Process Clause," Johnson, 369 F.3d at 263, Welch cannot establish his entitlement to federal habeas relief under the standards outlined in § 2244(d)(1).

Finally, even assuming for purposes of argument that it was clearly established

-36-

that the mere appearance of bias could result in a due process violation, the OCCA

reasonably concluded that Welch and his counsel expressly waived any such claim prior

to trial. In Liljebert v. Health Serv. Acquisition Corp., 486 U.S. 847, 866 (1988), the

Supreme Court noted (albeit in the context of a civil case tried in federal district court)

that "[a] full disclosure" by the trial judge of the possible bases for disqualification can

"completely remove[] any basis for questioning the judge's impartiality . . . ." That is

precisely what occurred here. As noted by the OCCA, during a pre-trial hearing the trial

judge advised the parties that Detective Lucas was his son and asked the attorneys, as

well as Welch himself, whether they had any objections to the trial judge presiding over

the trial. Both Welch and his counsel expressly stated on the record that they had no

objections.

*Admission of victim impact evidence during second stage proceedings*

Welch contends that the admission, during the second-stage proceedings, of certain

victim impact evidence violated his constitutional right to a fundamentally fair sentencing

hearing. More specifically, Welch complains that all five of the second-stage witnesses

who provided victim impact testimony, Talley Cooper's older sister, her two brothers, her

husband, and her mother, were allowed to state that they believed death was the

appropriate punishment for Welch.

Welch first raised this issue on direct appeal. The OCCA rejected it, stating as

follows:

> In his sixth proposition of error, [Welch] claims he was denied a fair
> sentencing proceeding by the admission of improper, prejudicial and

irrelevant victim impact evidence.

\* \* \*

[Welch] . . . claims there is no provision allowing for an opinion of a recommended sentence in capital cases in Oklahoma and asks this Court to reconsider its prior decisions upholding sentence recommendations. Section 984 [of Title 22 of the Oklahoma Statutes] authorizes "the victim's opinion of a recommended sentence." Based on this language, we continue to find that sentencing recommendations by victims or their survivors are relevant and admissible as long as the recommendation is given as a straight-forward, concise response to a question asking what the recommendation is; or a short statement of recommendation in a written statement, without amplification. Wood, 1998 OK CR 19, at ¶ 46, 959 P.2d at 12. Because each of the sentence recommendations in this case fit within the above parameters, no error occurred.

Welch, 2 P.3d at 373-74.

Welch contends that the OCCA's ruling is not entitled to deference under the AEDPA because the OCCA relied explicitly and solely on Oklahoma statutes and case law in analyzing Welch's claim. Thus, Welch contends, we must review the claim de novo. For the reasons discussed below, we agree with Welch on this point.

In Booth v. Maryland, 482 U.S. 496, 501-02 (1987), the Supreme Court addressed the question of "whether the Eighth Amendment prohibits a capital sentencing jury from considering victim impact evidence." The petitioner in Booth had been convicted of two counts of first-degree murder and sentenced to death. During the sentencing phase of his trial, the prosecution, consistent with Maryland law, presented a written victim impact statement (VIS) that "provided the jury with two types of information." Id. at 502. "First, it described the personal characteristics of the victims and the emotional impact of the crimes on the family." Id. "Second, it set forth the family members' opinions and

-38-

characterizations of the crimes and the defendant." Id. The Supreme Court, by a 5-4 majority, concluded that victim impact evidence was per se inadmissible during the sentencing phase of a capital trial, except to the extent that it related "directly to the circumstances of the crime . . . ." Id. at 507 and n.10. With respect to the first type of information contained in the VIS, the Court determined it might "be wholly unrelated to the blameworthiness of a particular defendant," id. at 504, and, in any event, "create[d] an impermissible risk that the capital sentencing decision w[ould] be made in an arbitrary manner." Id. at 505. As for the second type of information contained in the VIS (family members' opinions and characterizations of the crimes), the Court concluded it could "serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." Id. at 508.

In 1989, the Court extended the rule announced in Booth to statements made by a prosecutor to a capital sentencing jury regarding the personal qualities of the victim. See South Carolina v. Gathers, 490 U.S. 805 (1989).

In 1991, the Court revisited these issues, and partially reversed course, in Payne v. Tennessee, 501 U.S. 808 (1991). The petitioner in Payne was sentenced to death for the murders of a woman and her two-year-old daughter. During the sentencing phase of trial, the prosecution presented testimony from the woman's mother, who testified about the physical and emotional impact the murders had on the woman's surviving three-year-old son (who had also been assaulted by the defendant but had survived). During closing arguments in the sentencing phase, the prosecutor commented on this testimony and

discussed the continuing effects of the boy's experience.  The Court, expressly overruling

its decisions in Booth and Gathers, held that "if the State chooses to permit the admission

of victim impact evidence and prosecutorial argument on that subject, the Eighth

Amendment erects no per se bar."  Id. at 827.[9]  Instead, the Court held, the only

constitutional limitation on such evidence is if it "is so unduly prejudicial that it renders

the trial fundamentally unfair . . . ."  Id. at 825.  In such an event, the Court indicated, "the

Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  Id.

Importantly, Payne left one significant portion of Booth untouched.  Unlike Booth,

Payne did not involve any testimony or statements from the victim's family members

regarding their "opinions and characterizations of the crimes and the defendant."  Booth,

482 U.S. at 502.  Thus, although the Court expressly overruled Booth, it stated in a

---

[9] In reaching this conclusion, the Court specifically outlined why victim impact evidence was relevant to a capital jury's sentencing decision:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant.  "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."  Booth, 482 U.S., at 517, 107 S.Ct. at 2540 (WHITE, J., dissenting) (citation omitted).  By turning the victim into a "faceless stranger at the penalty phase of a capital trial," Gathers, 490 U.S., at 821, 109 S.Ct. at 2216 (O'CONNOR, J., dissenting), Booth deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.

Id. at 825.

-40-

footnote:

> Our holding today is limited to the holding[] in <u>Booth</u> . . . that evidence . . . relating to the victim and the impact of the victim's death on the victim's family [is] inadmissible at a capital sentencing hearing. <u>Booth</u> also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment. No evidence of the latter sort was presented at the trial in this case.

<u>Payne</u>, 501 U.S. at 830 n.2.

This circuit and several other circuits have expressly recognized that the portion of <u>Booth</u> prohibiting family members of a victim from stating "characterizations and opinions about the crime, the defendant, and the appropriate sentence" during the penalty phase of a capital trial survived the holding in <u>Payne</u> and remains valid. See <u>United States v. Brown</u>, 441 F.3d 1330, 1352 (11th Cir. 2006); <u>Humphries v. Ozmont</u>, 397 F.3d 206, 217 (4th Cir. 2005) (en banc); <u>Parker v. Bowersox</u>, 188 F.3d 923, 931 (8th Cir. 1999); <u>Hain v. Gibson</u>, 287 F.3d 1224, 1238-39 (10th Cir. 2002); <u>United States v. McVeigh</u>, 153 F.3d 1166, 1217 (10th Cir. 1998); <u>Woods v. Johnson</u>, 75 F.3d 1017, 1038 (5th Cir. 1996).

Turning to Welch's arguments, it is clear that the testimony he now challenges was improperly admitted. All five of the second-stage witnesses presented by the prosecution stated they thought Welch should receive the death penalty. This testimony was clearly contrary to <u>Payne</u> and <u>Booth</u> and resulted in a violation of Welch's Eighth Amendment rights. While the OCCA specifically resolved the issue, it relied solely on Oklahoma state law and made no attempt to reconcile <u>Payne</u> or <u>Booth</u>. Its decision is contrary to

-41-

"clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), making federal habeas relief available.

The question then becomes whether the constitutional error resulting from the admission of these victim impact statements was harmless, or instead requires the reversal of Welch's death sentence. See Willingham v. Mullin, 296 F.3d 917, 931 (10th Cir. 2002) (applying harmless error analysis to similar error arising in habeas case filed by Oklahoma capital prisoner); Hain, 287 F.3d at 1239-40 (same). Because the OCCA erroneously concluded that the admission of the victim impact evidence was proper, it did not address the issue of harmlessness. Accordingly, we must "consider the question of harmless error de novo under the general standard established for habeas cases in" Brecht. Willingham, 296 F.3d at 931. Under that standard, the question is "whether the objectionable victim impact evidence had substantial and injurious effect or influence in determining the jury's [death penalty] verdict . . . ." Id. (internal quotation marks omitted).

After carefully examining the trial transcript, we conclude that the error was, indeed, harmless. As noted, the prosecution alleged, and the jury found, the existence of two aggravating factors, both of which were amply supported by the evidence. In particular, the jury reasonably found, based upon the first stage evidence that was incorporated by reference into the second-stage proceedings, that Welch's brutal and demeaning attack on Talley Cooper was especially heinous, atrocious and cruel. The jury also reasonably found, based upon Welch's commission of three violent attacks against

-42-

women (two of which were fatal and the third that resulted in serious injuries to the victim), as well as Welch's lengthy criminal history, the existence of a probability that Welch would commit criminal acts of violence that would constitute a continuing threat to society in the future. In light of the existence of these two aggravators, we conclude that the improper aspects of the victim impact evidence did not play a substantial role in the jury's assessment of the death penalty in this case.

*Ineffective assistance of trial counsel*

Welch contends that his trial counsel was constitutionally ineffective for (a) failing to prohibit the introduction of Welch's prior convictions, (b) failing to impeach the rebuttal testimony of Katherine Roberts, (c) failing to list adaptability to prison life as a mitigating circumstance, (d) failing to request recusal of the trial judge (due to the trial judge's relationship to Detective Lucas), (e) failing to advise Welch regarding the decision to testify in his own defense, and (f) failing to investigate and present available mitigating evidence. Welch first raised these claims on direct appeal and the OCCA rejected them on the merits.

Welch's claims are governed by the governed by the familiar two-part test announced in Strickland v. Washington, 466 U.S. 668 (1984). Under that test, Welch must establish that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. Id. at 688, 694; see also Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

Notably, Welch acknowledges that the OCCA applied the Strickland standards in rejecting each of his claims of ineffective assistance. Thus, he concedes that he cannot obtain federal habeas relief on any of those claims unless he establishes that the OCCA's resolution of the claim(s) was contrary to, or an unreasonable application of, Strickland.

*a) Failure to prohibit introduction of Welch's prior convictions*

Welch contends there was "no valid trial strategy" to justify his trial counsel telling the jury during opening statements that Welch had been convicted of crimes and was serving life in prison without the possibility of parole, or to justify his trial counsel asking Welch, during his direct examination, about his string of prior felony convictions. Welch raised this same issue on direct appeal and the OCCA rejected it:

> [Welch] attacks counsel's decision to elicit his prior Tulsa County convictions that did not involve dishonesty along with some of the circumstances of that case without obtaining a ruling that these prior felony convictions, for purposes of impeachment, were more probative than prejudicial. The record shows this was part of the defense's strategy. [Welch]'s defense to the instant case was he never intended to kill Cooper and her death was an accident that resulted from a consensual sexual encounter. To boost his credibility, defense counsel elicited [Welch]'s prior convictions and some of the facts about the Tulsa County crimes in an effort to show [Welch] was willing to admit and take responsibility for his prior misconduct. Defense counsel elicited facts about the Tulsa County crimes in lieu of merely listing them to show that [Welch] attacked Paige Hora because he thought she was trying to interfere with a drug deal in which he was acting as lookout. Counsel employed this strategy to avoid leaving the jury with the impression that [Welch] was a man who liked to terrorize and kill women.

> To further boost [Welch]'s credibility and his overall defense, defense counsel elicited from [Welch] that he had plead guilty to all his prior crimes, including the Tulsa County crimes, accepting responsibility for his wrongful acts. This strategy bolstered [Welch]'s claim that he went to trial in the instant case because he believed he was not guilty. Defense counsel

-44-

further elicited [Welch]'s Tulsa County convictions, for which [Welch] was serving a life plus consecutive forty-five year sentence, to argue [Welch] did not constitute a continuing threat because he would be incarcerated for the rest of his natural life. Inasmuch as [Welch] cannot overcome the presumption that the challenged action was sound trial strategy under the circumstances, this claim must fail.

Welch, 2 P.3d at 375.

Although Welch takes issue with the OCCA's conclusions, we conclude they are neither contrary to, nor an unreasonable application of, the standards outlined in Strickland. As noted by the OCCA, defense counsel's strategy appears to have been two-fold: (1) to bolster Welch's credibility during the first stage proceedings (by demonstrating that Welch was willing to admit to and take responsibility for his criminal conduct) in an attempt to avoid Welch being convicted of first degree malice murder; and (2) to set the stage for rebutting the prosecution's assertion that he represented a continuing threat to society by demonstrating that he was already serving a prison sentence that would last for most of his adult lifetime. Given the horrendous nature of Talley Cooper's rape and murder, and the substantial weight of the evidence against Welch, we conclude these strategies were entirely reasonable.

*b) Failure to impeach the rebuttal testimony of Katherine Roberts*

Welch contends that his trial counsel failed to properly impeach the rebuttal testimony of prosecution witness Katherine Roberts who, as previously noted, testified that Talley Cooper called her several weeks prior to the murder and told her about being scared by a cable television repairman who visited her house. Welch asserts that Roberts failed to mention this telephone conversation when she was interviewed by the police

-45-

following Talley Cooper's murder, and argues that his trial counsel should have cross-examined Roberts about this issue. Welch asserted the same arguments on direct appeal, and the OCCA rejected them, stating as follows:

> [Welch] also attacks counsel's failure . . . to impeach [Katherine] Roberts' . . . . Counsel did lodge a hearsay objection to Roberts' testimony concerning her telephone call with Cooper which was overruled. As discussed in proposition three, a portion of Roberts' testimony was admissible and the remainder, though error, was harmless beyond a reasonable doubt. Although defense counsel did not cross-examine Roberts about why she had not mentioned Cooper's telephone call to her about the cableman during the initial investigation, defense counsel did ask questions to illustrate that Roberts did not know as much as she believed about Cooper. Asking questions to imply Roberts was making up her testimony about the telephone call could easily backfire and counsel was not ineffective for choosing to avoid that pitfall.

Welch, 2 P.3d at 375-76.

The OCCA's conclusion is neither contrary to, nor an unreasonable application of, Strickland. Although Welch contends that Roberts' failure to tell the police about the phone call immediately following the murder would have constituted "powerful impeachment" evidence, Aplt. Br. at 83, he readily acknowledges that he does not know what Roberts' explanation would have been. Thus, as noted by the OCCA, the questioning now proposed by Welch could have "backfired" on his counsel, by placing his counsel in a negative light by attempting to suggest that the victim's best friend was a liar. Moreover, even assuming that Welch's trial counsel should have cross-examined Roberts as now suggested by Welch, it appears clear after reviewing the trial transcript that such cross-examination would have had little, if any, effect on the outcome of the first stage proceedings. Although Welch suggests that Roberts' rebuttal testimony was

-46-

"very damaging" to him, we are persuaded that the jury would have convicted Welch

even absent Roberts' testimony. Thus, in sum, we conclude Welch was not prejudiced by

trial counsel's alleged failure to cross-examine Roberts.

*c) Failure to list adaptability to prison life as a mitigating circumstance*

Welch next complains that his trial counsel "failed [during the second-stage

proceedings] to list as a mitigating circumstance the probability that Welch could adapt to

prison life." Aplt. Br. at 83. The OCCA rejected this same argument in affirming

Welch's conviction and sentence:

> [Welch] complains about counsel's failure to list adaptability to the structured environment of prison life as a mitigating circumstance in [second-stage] Instruction 13. [Welch] contends the failure to specifically list this mitigating circumstance allowed the jury to disregard this mitigating evidence. With this contention, we cannot agree. The jury was instructed that "mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case." Instruction 13, listing several specific mitigating circumstances, also provided that the jury could "decide that other mitigating circumstances exist, and if so, [could] consider those circumstances as well." While adaptability to prison life was not specifically listed, the jury was instructed it could consider the evidence presented and determine what evidence was mitigating. The majority of [Welch]'s second stage defense focused on his adaptability to a structured prison environment which defense counsel vigorously argued during closing argument to rebut the State's continuing threat contention. Given this record, we find the administered instructions adequately allowed the jury to consider the evidence of adaptability to prison life and [Welch] was not prejudiced by counsel's failure to include it in Instruction 13. (citation omitted)

Welch, 2 P.3d at 376.

Although Welch disagrees with the OCCA's analysis, we conclude, after

reviewing the transcript of the second-stage proceedings, that it is neither contrary to, nor an unreasonable application of, <u>Strickland</u>. As noted by the OCCA, the second-stage instructions clearly informed the jury that they could consider whatever mitigating circumstances they believed to be appropriate. That instruction, together with defense counsel's clear focus on establishing that Welch was highly adaptable to the prison environment and was non-violent while incarcerated, would have allowed the jury to give weight to this mitigating circumstance, even though it was not specifically listed in the second-stage instructions. Moreover, given the strength of the two aggravating circumstances, there is not a reasonable likelihood that the outcome of the second-stage proceedings would have been different had adaptability to prison been specifically listed as a mitigating circumstance in the second-stage jury instructions.

*d) Failure to request recusal of the trial judge*

Welch contends his counsel "inexplicably chose to not seek recusal of the trial judge when it became known that the lead detective for the State was the trial judge's son." Aplt. Br. at 85. According to Welch, "[t]here is no strategic, or even rational, reason why a trial lawyer in a capital case would choose a trial judge knowing that the State's case agent and star witness [wa]s the judge's own son." Id. The OCCA rejected these same arguments, stating:

> [Welch] also attacks counsel's . . . failure to request recusal of the trial judge. * * * [Defense] counsel was not ineffective in failing to ask the trial judge to recuse. As discussed in propositions two and five, [Welch] waived his right to have the trial judge disqualified and he was not prejudiced by the trial court's rulings during Detective Lucas's testimony. As such, he cannot show prejudice and th[is] claim must fail.

-48-

Welch, 2 P.3d at 375-76.

For the reasons already discussed above in connection with the "failure to recuse" issue, the OCCA reasonably concluded that Welch was not prejudiced by his trial counsel's failure to request the trial judge's recusal. Thus, the OCCA's decision was neither contrary to, nor an unreasonable application of, Strickland.

*e) Failure to advise Welch regarding the decision to testify*

Welch contends that his trial counsel "did not properly advise [him] concerning the risks of testifying prior to [him] taking the stand." Aplt. Br. at 86. As a result, Welch contends, he "was not properly prepared or ready to testify . . . ." Id. The OCCA considered and rejected this same claim in disposing of Welch's direct appeal:

> [Welch] claims counsel failed to adequately advise him and provide him with sufficient information on which to base an intelligent decision on whether or not to testify. Alternatively, [Welch] asserts a claim of state induced ineffective assistance of counsel by arguing counsel was forced to present [Welch]'s testimony after the State was allowed to introduce evidence of the Stevens homicide. As discussed in proposition one, evidence from the Stevens homicide was properly admitted to prove identity and absence of mistake or accident. As such [Welch]'s state induced ineffective assistance of counsel claim must fail. Furthermore, there is no evidence to support [Welch]'s claim that he was inadequately advised about the risks of testifying. Defense counsel noted on the record following the close of the State's evidence that he had spoken to his client and that [Welch] wished to testify. Defense counsel did not mention calling [Welch] as a witness during opening statement thereby leaving the option open so an intelligent decision could be made following the state's case-in-chief. Following the compelling evidence that demonstrated his guilt, [Welch] elected to testify to tell his version of what happened. Counsel attempted to guide his client and bolster his credibility throughout the presentation of [Welch]'s testimony. Based on this record, we cannot find [Welch] was inadequately advised or that counsel was ineffective. Accordingly, this claim must fail.

-49-

Welch, 2 P.3d at 376.

Again, the OCCA's conclusion is neither contrary to, nor an unreasonable application of, Strickland. As noted by the OCCA, the trial transcript indicates that, following the conclusion of the prosecution's case-in-chief, defense counsel informed the trial judge: "Judge, at this time, from talking to Mr. Welch, he wishes to take the stand." Trial Tr., Vol. V at 1109. Further, as also noted by the OCCA, the trial transcript indicates that Welch's trial counsel "attempted to guide [Welch] and bolster his credibility throughout" his direct and redirect examination. What defense counsel obviously could not control was the substance of Welch's testimony regarding how Talley Cooper and Debra Stevens died. In any event, even assuming that defense counsel erred in either failing to urge Welch not to testify or in failing to properly prepare him to testify, it is clear that, given the strength of the prosecution's evidence, the error was not prejudicial.

*f) Failure to investigate and present mitigating evidence*

In his final claim of ineffective assistance, Welch contends that his trial counsel failed to adequately investigate and present mitigating evidence available from his relatives. Welch asserted this identical claim on direct appeal, and the OCCA rejected it, stating:

> More troubling is the complaint raised in [Welch]'s application for an evidentiary hearing alleging counsel failed to investigate and use available mitigating evidence. [Welch] argues counsel was deficient by failing to investigate and present the testimony of his family members to mitigate punishment especially in light of the victim impact evidence. Pursuant to Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals,

-50-

Title 22, Ch. 18, App. (1998), [Welch] has filed an application for an evidentiary hearing and to supplement the record. [Welch] includes, among other things, affidavits from family members who were willing to testify about their relationship with [Welch] and request mercy, but who were not contacted by defense counsel. (citation omitted). Defense counsel did speak with [Welch]'s sister briefly before trial began. Counsel initially asked her to testify, but advised her she would not be needed after she told him that [Welch] had touched her inappropriately when they were adolescents. (citation omitted). At first glance, counsel's failure to call [Welch]'s family members to testify seems attributable to sound strategy since the family knew of the inappropriate touching incident and one could see how counsel would not want this information before the jury. However, counsel elicited this information from his expert psychiatrist thereby eliminating that strategy argument.

It is all too tempting to second guess counsel and wonder why he did not use these family members given the compelling victim impact evidence and the resulting death sentence. However, that is precisely the pitfall we are to avoid. This Court will not second-guess trial strategy through the distorting effects of hindsight. (citation omitted). The record shows defense counsel did elicit much of the family members' proposed testimony concerning [Welch]'s background through Dr. Lindsey, the defense's psychiatric expert. It appears counsel chose not to call family members because he feared the jurors' reactions to the cross-examination of the family members about the improper touching incident. Instead, he chose to present a more clinical defense. The record further shows counsel mounted a well-reasoned defense to the aggravating factors and chose to focus on [Welch]'s adaptability to prison life with references to [Welch]'s mitigating background as a sub-theme. Because the evidence in aggravation was so strong and counsel's decision could be considered sound trial strategy, we find that an evidentiary hearing is not warranted because the application and supplemental materials do not contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was deficient for failing to utilize the complained-of evidence in second stage.

Welch, 2 P.3d at 376-77.

In our view, the OCCA's conclusion on this claim is neither contrary to, nor an unreasonable application of, Strickland. As noted by the OCCA, Welch's trial counsel

-51-

presented a single witness, psychiatrist Ethan Lindsey, in Welch's defense. Lindsey

testified at length about his psychiatric assessment of Welch[10] and, in doing so, recounted

what he believed were certain key and/or troubling aspects of Welch's childhood (e.g., a

severe illness when he was an infant; the observation of unusual sexual acts as an

adolescent; fairly significant alcohol abuse as an adolescent) that lead to the development

of the psychiatric problems diagnosed by Lindsey. Those aspects, Lindsey noted in his

testimony, were taken from not only Welch's own statements, but also from Lindsey's

discussions with Welch's mother and sister. In other words, Lindsey provided the jury

with a summary of the key events that may have led Welch to commit the acts of sexual

violence against Cooper and Stevens. Although Welch now contends that his relatives

could have provided additional mitigating information, he fails to specify in his appellate

brief precisely what information he believes would have made a difference in the

outcome of the second-stage proceedings. In any event, as noted by the OCCA, the

aggravating evidence was so strong as to foreclose any reasonable probability that the

presentation of additional testimony from Welch's relatives would have produced a

different outcome.

### *Cumulative error*

In his final issue, Welch contends his trial was rendered fundamentally unfair by

what he refers to as "the accumulation of constitutional errors." Aplt. Br. at 89. Welch

---

[10] Lindsey concluded that, as a result of a severe medical condition when Welch was an infant, Welch developed severe attachment problems that ultimately led to an antisocial personality disorder.

asserted a similar claim on direct appeal and the OCCA rejected it:

In his final proposition of error, [Welch] contends that, even if no individual error merits reversal, the cumulative effect of the errors in his case necessitates either reversal of his conviction or a modification of his sentence. We have thoroughly reviewed [Welch]'s claims and the record in this case which reveals no error which, singly or in combination, would justify either modification or reversal. Any irregularities or errors were harmless beyond a reasonable doubt. Because we find no error that warrants relief, this claim is denied. (citation omitted).

Welch, 2 P.3d at 377.

We, like the district court, found additional constitutional error in the admission of the victim impact testimony from five witnesses. Because we have identified additional error, and because the OCCA could not have considered the aggregate prejudicial impact of the individual errors, we must review Mr. Welch's cumulative error claim de novo. See Malicoat, 426 F.3d at 1263 ("the OCCA's opinion does not clearly indicate that it considered, in the aggregate, the prejudicial effect of the individual errors[;] [a]ccordingly . . . we afford [the defendant] the benefit of the doubt and review his cumulative error claim de novo"); Cargle v. Mullin, 317 F.3d 1196, 1207 (10th Cir. 2003) (explaining that "to deny cumulative-error consideration of claims unless they have first satisfied their individual substantive standards for actionable prejudice would render the cumulative error inquiry meaningless, since it would be predicated only upon individual error already requiring reversal") (internal quotation marks and citations omitted).

Cumulative-error analysis "merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer

be determined to be harmless."  Hamilton v. Mullin, 436 F.3d 1181, 1196 (10th Cir. 2006) (internal quotation marks omitted).  Even under the de novo standard, we conclude that, in light of the overwhelming evidence against Welch, the cumulative effect of such errors did not "'ha[ve] a substantial and injurious effect or influence in determining the jury's verdict,'" Brecht, 507 U.S. at 637 (quoting Kotteakos, 328 U.S. at 776), or deprive him of his right to a fair trial.

AFFIRMED.